FILED

JUL 15 2026

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY MM DEP CLK

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NORTH CAROLINA**

**WESTERN DIVISION**

**EBONY V. PETERSON,**

Plaintiff,

v. Civil Action No. 5:26-CV-00481-FL

**NORTH CAROLINA STATE UNIVERSITY,**

Defendant.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Ebony V. Peterson, proceeding pro se, alleges as follows:

## I. NATURE OF THE ACTION

1. This is an employment-discrimination action arising from Defendant's treatment of Plaintiff after she sought reasonable workplace accommodations for medical conditions affecting her mobility.

2. Plaintiff brings this action under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101–12117, to the extent permitted by applicable law.

3. Defendant employed Plaintiff as the Finance Director for the Commercial Leap Ahead for Wide Bandgap Semiconductors ("CLAWS") Hub within NC State's College of Engineering. Plaintiff's Human Resources classification was Business Manager II, with the working title CLAWS Finance Manager, while Finance Director was the operational title reflected in her University email signature, office signage, and daily work.

4. Plaintiff worked while managing chronic medical conditions affecting her mobility, including arthritis affecting her knee and foot. Before the events underlying this action, Plaintiff had not required formal workplace accommodations because she could perform the essential functions of her position within the existing work environment.

5. The work environment changed when the elevator nearest Plaintiff's office suite became inoperable for an extended period. The only functioning elevator was substantially farther from her office, increasing the walking required to enter, leave, and move throughout the building. The additional walking aggravated Plaintiff's pain and mobility limitations.

6. Plaintiff sought practical means of continuing to work, including requesting information about the elevator repairs and available transportation assistance. She then requested reasonable accommodations through Defendant's Office of Equal Opportunity ("OEO"), including temporary remote-work flexibility and other reasonable accommodations to reduce the impact of the prolonged elevator outage.

7. Plaintiff cooperated with OEO, submitted medical information, responded to requests for clarification, and participated in the interactive process. Defendant terminated her employment while that process remained pending and before issuing a final determination concerning her requested accommodations.

8. Defendant later asserted that Plaintiff's employment ended because of performance concerns. Plaintiff disputes that explanation. She alleges that it does not accurately reflect the concerns communicated to her during employment, her efforts to address matters that were raised, the developing nature of the newly established CLAWS Hub, or the circumstances and timing surrounding her termination.

9. Plaintiff seeks the legal and equitable relief available for the alleged violations, including

recovery for lost wages and employment benefits, compensatory relief where legally recoverable, correction of employment records where appropriate, pre- and post-judgment interest, costs, and any other relief the Court determines to be just and lawful. Plaintiff does not seek reinstatement to her former CLAWS position.

## II. JURISDICTION, ADMINISTRATIVE EXHAUSTION, AND VENUE

10. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal disability-discrimination laws, including the ADA and Section 504 of the Rehabilitation Act.

11. The ADA incorporates the enforcement procedures applicable to covered employment-discrimination claims through 42 U.S.C. § 12117. Section 504 prohibits disability discrimination by covered programs or activities receiving federal financial assistance.

12. Plaintiff timely submitted a Charge of Discrimination to the Equal Employment Opportunity Commission ("EEOC"), Charge No. 433-2025-03291, alleging disability discrimination and (See Exhibit 1.) retaliation. The charge was perfected and signed under penalty of perjury on February 18, 2026.

13. The EEOC subsequently issued Plaintiff a Notice of Right to Sue dated April 22, 2026. (See Exhibit 2.) SHOWN ON NOTICE]. Plaintiff commenced this action within the applicable filing period after receiving that notice.

14. Venue is proper in the Eastern District of North Carolina under 28 U.S.C. § 1391 because Defendant resides or conducts substantial operations within this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Raleigh, Wake County, North Carolina.

15. Wake County is within the Western Division of the United States District Court for the Eastern District of North Carolina.

## III. PARTIES

16. Plaintiff Ebony V. Peterson is an adult resident of Wake County, North Carolina. At all times relevant to this action, Plaintiff was qualified by experience and training for the position she held and was capable of performing its essential functions with or without reasonable accommodation.

17. Defendant North Carolina State University is a public university located in Raleigh, North Carolina, and a constituent institution of the University of North Carolina System. Defendant employed substantially more than fifteen employees, employed Plaintiff during the period relevant to this action, and received federal financial assistance, including funding associated with the CLAWS Hub. Defendant therefore constituted Plaintiff's employer and was subject to applicable federal disability-discrimination requirements.

## IV. STATEMENT OF FACTS

A. Plaintiff's Employment Background

18. On or about August 1, 2024, Plaintiff began her employment with Defendant in the finance leadership position supporting the Commercial Leap Ahead for Wide Bandgap Semiconductors ("CLAWS") Hub within the College of Engineering. Plaintiff held a Master of Business Administration ("MBA") degree and more than twenty years of professional experience in finance, business operations, budgeting, compliance, and administration. Defendant verified Plaintiff's education and professional qualifications as part of its hiring process. Plaintiff's annual

salary was $100,000.

19. Defendant's position description required a bachelor's degree and three years of professional accounting experience, including at least one year of supervisory experience, or an equivalent combination of education and experience. Plaintiff exceeded those minimum qualifications through her education and professional experience.

20. The CLAWS Hub was a newly established regional innovation hub funded through a $39.4 million award from the United States Department of Defense under the Microelectronics Commons Program. The Hub was created to advance semiconductor research and commercialization through collaboration among North Carolina State University, partner universities, industry members, and federal stakeholders.

21. Plaintiff's Human Resources classification identified her position as Business Manager II with the working title CLAWS Finance Manager. Operationally, Plaintiff served as the Finance Director for the CLAWS Hub. The title "Finance Director" was reflected in Plaintiff's official University email signature, office signage, and the responsibilities she performed throughout her employment.

22. As Finance Director, Plaintiff was responsible for overseeing the financial administration of the CLAWS Hub, including budgeting, financial forecasting, sponsored research administration, regulatory compliance, financial reporting, coordination with principal investigators, University departments, and external partners, and assisting in the development of financial and administrative processes necessary to support the newly established Hub.

23. At the time Plaintiff assumed her position, the CLAWS Hub was a newly established organization. Many of its financial, administrative, and operational processes were still being developed. Plaintiff worked with University leadership and other stakeholders to establish

procedures, address operational challenges, and implement financial processes necessary to support the Hub's operations.

4. On or about February 1, 2025, Defendant assigned Robert ("Bob") Therrien, the CLAWS Hub's Chief Technology Officer ("CTO"), as Plaintiff's direct supervisor. In that role, Mr. Therrien was responsible for supervising Plaintiff's work, communicating performance expectations, and participating in employment decisions affecting Plaintiff.

25. Following the change in supervision, Plaintiff continued performing her assigned duties while working with Mr. Therrien and other university personnel to address operational and financial matters associated with the newly established CLAWS Hub.

## B. Plaintiff's Disability and Defendant's Knowledge

26. At all times relevant to this action, Plaintiff had chronic medical conditions affecting her mobility, including arthritis in her knee and foot. These conditions periodically caused pain and made prolonged walking, climbing stairs, and traveling long distances on campus difficult.

27. Before requesting formal accommodations, Plaintiff openly discussed her mobility limitations in the workplace. Plaintiff informed her direct supervisor, Robert ("Bob") Therrien, that she had arthritis affecting her knee and foot and that walking could be difficult depending on her symptoms.

28. Plaintiff's mobility limitations were also known to other members of the CLAWS Hub and University personnel. Because walking stairs aggravated her condition, Plaintiff routinely used the elevator to attend meetings held on other floors of the building. Plaintiff's use of the elevator and her difficulty with prolonged walking were observable to coworkers and supervisors during the course of her employment.

29. Prior to the events giving rise to this action, Plaintiff did not request formal workplace accommodations because she was able to perform the essential functions of her position within the existing work environment. At that time, the elevator nearest Plaintiff's office provided reasonable access to her workspace and other areas of the building.

## C. The Workplace Environment Changed

30. During Plaintiff's employment, the elevator located nearest the CLAWS Hub offices became inoperable for an extended period. As a result, Plaintiff could no longer use the elevator that had provided the most direct access to her workspace and meetings within the building.

31. The only remaining operable elevator required Plaintiff to walk a substantially greater distance to reach her office, attend meetings, and perform other work-related responsibilities. During this same period, the remaining elevator also began experiencing operational issues, creating uncertainty regarding continued accessible access to Plaintiff's workplace.

32. Because of Plaintiff's arthritis and mobility limitations, the increased walking caused additional pain and made navigating the workplace significantly more difficult. Plaintiff sought updates regarding the elevator repairs and explored ways to continue performing the essential functions of her position while minimizing the impact of her mobility limitations.

33. Plaintiff also explored other options that would allow her to continue performing her job duties, including inquiring about transportation assistance available on campus for employees with mobility limitations.

34. When it became apparent that the elevator outage would not be resolved within a reasonable period of time and the increased walking continued to aggravate Plaintiff's medical condition, Plaintiff initiated Defendant's formal accommodation process through the Office of

Equal Opportunity ("OEO").

## D. Plaintiff's Request for Reasonable Accommodation

35. After determining that the prolonged elevator outage and increased walking were significantly aggravating her mobility limitations, Plaintiff contacted Defendant's Office of Equal Opportunity ("OEO") to request reasonable accommodations under the Americans with Disabilities Act.

36. Plaintiff requested reasonable accommodations that would allow her to continue performing the essential functions of her position while the accessibility issues remained unresolved, including temporary remote-work flexibility and other reasonable accommodations to reduce the impact of the prolonged elevator outage.

37. In support of her request, Plaintiff provided medical documentation describing her medical conditions and the limitations they imposed on prolonged walking. Plaintiff responded to requests for additional information and fully participated in Defendant's accommodation process.

38. During the interactive process, OEO advised Plaintiff that flexible work arrangements could be discussed with her department while her accommodation request remained under review. Plaintiff followed that guidance and communicated with her supervisor regarding temporary workplace flexibility.

39. On April 25, 2025, Plaintiff requested permission from Mr. Therrien to work remotely on April 29, 2025, while her accommodation request remained pending. Plaintiff explained that OEO had advised her that she could request a flexible work arrangement from her department while the accommodation process was ongoing.

40. Mr. Therrien denied Plaintiff's request, stating that he wanted Plaintiff in the office because

he planned to conduct meetings regarding the CLAWS Hub's financial operations. Plaintiff complied with her supervisor's directive and reported to work as instructed.

E. Plaintiff's Termination During the Interactive Process

41. While Plaintiff's request for reasonable accommodation remained under review and before Defendant completed the interactive process, Plaintiff received a calendar invitation for a meeting entitled "CLAWS Financial Overview." Nothing in the invitation indicated that the meeting concerned disciplinary action, termination, or any other adverse employment action.

42. Plaintiff attended the meeting believing it concerned the financial operations of the CLAWS Hub. Instead, Plaintiff was informed that Defendant was terminating her employment.

43. At the time Plaintiff was informed that her employment would be discontinued, Plaintiff's request for reasonable accommodation remained pending before the Office of Equal Opportunity ("OEO"). Plaintiff had submitted the requested medical documentation, responded to requests for additional information, and continued participating in the interactive process in good faith.

44. On April 29, 2025, Defendant notified Plaintiff that her at-will employment would be discontinued pursuant to NC State Policy 05.15.01 and placed Plaintiff on paid administrative leave during the thirty-day notice period. The termination letter did not identify poor performance (See Exhibit 3.) as the reason for Plaintiff's separation.

45. Defendant later asserted performance-related reasons for Plaintiff's termination during the EEOC proceedings. Plaintiff disputes those assertions and alleges that they do not accurately reflect the circumstances surrounding her employment and termination.

## COUNT I

Disability Discrimination

(Section 504 of the Rehabilitation Act and, to the extent permitted by law, Title I of the Americans with Disabilities Act)

46. Plaintiff realleges and incorporates by reference Paragraphs 1 through 45 of this Complaint as though fully set forth herein.

47. At all times relevant to this action, Plaintiff was a qualified individual with a disability within the meaning of Section 504 of the Rehabilitation Act and, to the extent permitted by law, Title I of the Americans with Disabilities Act. Plaintiff was able to perform the essential functions of her position with reasonable accommodation.

48. Defendant had actual knowledge of Plaintiff's disability and mobility limitations. Plaintiff informed her supervisor of her medical condition, her mobility limitations were known within the workplace, and Defendant received Plaintiff's request for reasonable accommodation through the Office of Equal Opportunity.

49. After Plaintiff disclosed her disability and requested reasonable accommodation, Defendant terminated her employment while the accommodation process remained pending.

50. Plaintiff alleges that Defendant's decision to terminate her employment was motivated, at least in part, by Plaintiff's disability and her request for reasonable accommodation, in violation of applicable federal disability discrimination laws.

51. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered loss of income, loss of employment benefits, emotional distress, and other damages recoverable under applicable law.

## COUNT II

Failure to Provide Reasonable Accommodation

(Section 504 of the Rehabilitation Act and, to the extent permitted by law, Title I of the Americans with Disabilities Act)

52. Plaintiff realleges and incorporates by reference Paragraphs 1 through 45 as though fully set forth herein.

53. At all relevant times, Plaintiff was a qualified individual with a disability who was capable of performing the essential functions of her position with reasonable accommodation.

54. Defendant had actual knowledge of Plaintiff's disability and her need for reasonable accommodation. Plaintiff submitted a formal request for accommodations through Defendant's Office of Equal Opportunity ("OEO"), informed her supervisor of her medical condition, and provided medical documentation supporting her request.

55. Plaintiff requested reasonable accommodations that would allow her to continue performing the essential functions of her position, including temporary remote-work flexibility while the elevator nearest her office remained inoperable. Plaintiff cooperated with OEO, responded to requests for information, and participated in the interactive process in good faith.

56. Defendant terminated Plaintiff's employment before the interactive process was completed and before a final determination regarding Plaintiff's requested accommodations was made. Following Plaintiff's separation, OEO closed the accommodation process because Plaintiff was no longer employed by Defendant.

57. Plaintiff alleges that Defendant failed to complete the interactive process in good faith and failed to provide reasonable accommodation as required by applicable federal disability-discrimination law.

58. As a direct and proximate result of Defendant's actions, Plaintiff suffered lost wages, lost employment benefits, emotional distress, and other damages recoverable under applicable law.

## COUNT III

Retaliation (Section 504 of the Rehabilitation Act and, to the extent permitted by law, Title I of the Americans with Disabilities Act)

59. Plaintiff realleges and incorporates by reference Paragraphs 1 through 58 of this Complaint as though fully set forth herein.

60. Plaintiff engaged in protected activity by requesting reasonable accommodations for her disability through Defendant's Office of Equal Opportunity ("OEO") and by participating in the interactive process. Defendant was aware of Plaintiff's protected activity.

61. During the accommodation process, Plaintiff followed OEO's guidance and requested a temporary flexible work arrangement from her department while her accommodation request remained under review.

62. Defendant denied Plaintiff's request for remote work and instructed Plaintiff to report to work on April 29, 2025, for meetings concerning the CLAWS Hub's financial operations. Plaintiff complied with that directive.

63. On April 29, 2025, while Plaintiff's accommodation request remained pending and before the interactive process had been completed, Defendant terminated Plaintiff's employment.

64. Plaintiff alleges that Defendant subjected her to an adverse employment action because she

engaged in protected activity by requesting reasonable accommodations and participating in the interactive process, in violation of applicable federal disability-discrimination law.

65. As a direct and proximate result of Defendant's actions, Plaintiff suffered lost wages, lost employment benefits, emotional distress, and other damages recoverable under applicable law.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant and grant the following relief:

A. Declare that Defendant violated Plaintiff's rights under Section 504 of the Rehabilitation Act and, to the extent permitted by law, Title I of the Americans with Disabilities Act.

B. Award Plaintiff all back pay, lost wages, lost employment benefits, and other economic damages resulting from Defendant's unlawful conduct.

C. Award Plaintiff front pay in lieu of reinstatement, as appropriate.

D. Award Plaintiff compensatory damages as permitted by law for the emotional distress, inconvenience, humiliation, mental anguish, and other non-economic harm caused by Defendant's unlawful conduct.

E. Award Plaintiff pre-judgment and post-judgment interest as allowed by law.

F. Award Plaintiff her taxable costs of this action and any attorneys' fees authorized by applicable law.

G. Order Defendant to correct Plaintiff's personnel records, to the extent permitted by law, by removing or correcting any inaccurate, unsupported, or unlawful performance-related notations or other records relating to Plaintiff's separation from employment, should the Court determine such relief is appropriate.

H. Grant such other and further legal or equitable relief as the Court deems just and proper.

## VII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: 7-14-2026

Ebony V. Peterson

Ebony V. Peterson

4417 Wedgewood Drive

Raleigh, NC 27604

Telephone: (919) 332-1366

Email: ebonyvpeterson@gmail.com

Plaintiff, Pro Se